314 S.E.2d 865

**Robert L. BRAGG**

v.

**Leon GINSBERG,
Commissioner, etc., et al.**

**No. 16013.**

Supreme Court of Appeals
of West Virginia.

March 29, 1984.

Robert S. Baker, Adler & Baker, Beckley, for appellee.

Chauncey H. Browning, Atty. Gen., Mary Beth Kershner, Asst. Atty. Gen., Charleston, for appellants.

James M. Haviland, Charleston, for amicus curiae UMWA.

James Michael Kelly, Raymond Fullerton, Thomas D. Edmondson and John B. Koch, Washington, D.C., for amicus curiae U.S. Dept. of Agriculture.

McHUGH, Chief Justice:

This action is before this Court upon an appeal by certain officers of the West Virginia Department of Human Services[1] from a final order of the Circuit Court of Kanawha County, West Virginia. The appellants are Leon H. Ginsberg, Commissioner of the West Virginia Department of Human Services, James E. Bragg, a hearing officer with the department, and Matilda Webb, an "eligibility specialist" with the department. The appellee is Robert L. Bragg, an applicant for food stamps.

Under the food stamp program described below, the value of an applicant's assets, including certain motor vehicles, is relevant in determining an applicant's need for food stamps. As reflected in its final order, entered on March 28, 1983, the circuit court concluded that the fair market value of the appellee's motor vehicle did not render him ineligible from receiving food stamps. In particular, the appellants challenge in this appeal the conclusion of the circuit court that, for purposes of determining the appellee's food stamp eligibility, the fair market value of the motor vehicle should have been measured by the appellee's equity in the vehicle. The appellants contend that an owner's equity in a motor vehicle is not a proper standard in cases of this nature to be used in determining fair market value.

By order of this Court, the appellants were granted this appeal and, in addition, leave to move to reverse the final order of the circuit court. This Court has before it the appellant's amended petition for appeal, all other matters of record and the briefs filed by counsel. Furthermore, this Court has received briefs *amicus curiae* from the United States Department of Agriculture and the United Mine Workers of America, International Union.

## I

### Statement of Facts

In March, 1979, the appellee was laid off from his employment with the Long-Airdox Company of Oak Hill, West Virginia, and he began receiving unemployment compensation benefits. Prior to his lay off, the appellee purchased a 1979 four-wheel-drive Chevrolet truck. The appellee had a wife and one son.

The appellee applied to the West Virginia Department of Human Service for food stamps in May, 1979. An eligibility specialist of the department denied the appellee's application upon the basis that the appellee's motor vehicle constituted a financial resource to the appellee with a fair market value which exceeded the resource limits of eligibility for food stamps.

Subsequent to the decision of the eligibility specialist, a hearing upon the appellee's application was conducted before the department by a hearing officer. At that hearing, the appellee indicated that the truck was worth $6,500. The appellee further indicated that his equity in the vehicle was $400 and that he owed more than $6,000 upon the vehicle.

The decision of the eligibility specialist was affirmed by the hearing officer. Under 7 U.S.C. § 2014(g) [1977], a financial resource, such as the appellee's truck, is to be included in the determination of the appellee's eligibility for food stamps, "to the extent that the fair market value of any such vehicle exceeds $4,500...." The hearing officer reasoned that, because the appellee's $6,500 vehicle exceeded the $4,500 vehicle limit by $2,000, a resource was attributable to the appellee in considering food stamp eligibility. Inasmuch as the appellee's $2,000 resource exceeded the $1,750 limit in resources that a household such as appellee's may own to be eligible for food stamps (7 U.S.C. § 2014(g) [1977]), the appellee was held by the hearing officer to be ineligible. The hearing officer, with respect to the above calculations, did

1. Pursuant to *W.Va.Code,* 9–2–1a [1983], the department became known as the West Virginia Department of Human Services. The department was formerly known as the West Virginia Department of Welfare.

not consider evidence of the appellee's $400 equity in the vehicle.

The decision of the hearing officer, however, was reversed by the Circuit Court of Kanawha County, and the department was directed to determine an award of food stamps to the appellee. The reversal was based upon the conclusion of the circuit court that, for purposes of determining the appellee's food stamp eligibility, the fair market value of the appellee's truck should have been measured by the appellee's $400 equity in the vehicle. The January 25, 1983, letter memorandum of opinion of the circuit court stated, in part, as follows:

> The term 'financial resource' suggests either money or material possession which can be readily converted into money by which food can be purchased. Obviously, the book value of a motor vehicle is not a resource. Certainly, it can not be converted directly or indirectly into food purchasing power. The real resource attributable to the owner is his equity in that motor vehicle.

> [T]he term 'fair market value' as used in 7 U.S.C. § 2014(g) must be construed to mean that value which could be realized by the owner if the vehicle were to be sold on the open market. In this case, that value to the petitioner is $400, substantially less than the maximum limit of $1,750.

The final order of the circuit court, entered on March 28, 1983, stated as follows in paragraph number two:

> The motor vehicle resource evaluation procedures contained in the Federal Food Stamp Act of 1977, 7 U.S.C. § 2014(g),

and embodied in the regulations of West Virginia Department of Welfare, in Section 4310(c) of the Economic Services Manual, shall henceforth be construed in such a way that the 'fair market value' as used in 7 U.S.C. § 2014(g) will mean that value which could be realized by the owner if the vehicle could be sold on the open market.

> Furthermore, that order directed the West Virginia Department of Human Services to amend its Economic Services Manual to coincide with the above construction of 7 U.S.C. § 2014(g) [1977], by the circuit court.

## II

### The Statutory and Regulatory Scheme

The claim of the appellee for food stamps finds its origin in the federal "Food Stamp Act of 1977." 7 U.S.C. § 2011 [1977], et seq.[2] In 7 U.S.C. § 2011 [1977], a congressional declaration of policy concerning food stamps is set forth. That statute provides, in part, as follows: "To alleviate ... hunger and malnutrition, [caused by limited food purchasing power] a food stamp program is herein authorized which will permit low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation."[3]

At the federal level, the food stamp program is administered by the Secretary of the United States Department of Agriculture, 7 U.S.C. § 2013(a) [1977], and at the state level,[4] in West Virginia, by the West

---

**2.** The federal Food Stamp Act of 1977, Pub.L. No. 95–113, 91 Stat. 958 [1977], amended "The Food Stamp Act of 1964," Pub.L. No. 88–525, 78 Stat. 703 [1964].

**3.** 7 U.S.C. § 2014(a) [1977], provides, in part, as follows: "Participation in the food stamp program shall be limited to those households whose incomes and other financial resources, held sin-

gly or in joint ownership, are determined to be a substantial limiting factor in permitting them to obtain a more nutritious diet."

**4.** The state agency of those states desiring to participate in the food stamp program must submit to the United States Department of Agriculture a plan specifying the manner in which the program will be conducted within the state. 7 U.S.C. § 2020(d) [1977].

Virginia Department of Human Services.[5] Pursuant to the program, state agencies issue food stamps to eligible households in order to provide an opportunity to such households to obtain a more nutritious diet. The food stamps are used to purchase food from certain food stores, and the stamps are subsequently redeemed by the federal government. 7 U.S.C. § 2012(e) [1977]; 7 U.S.C. § 2013(a) [1977].

Eligibility standards of a household to receive food stamps are determined by federal law, rather than by state law. As 7 U.S.C. § 2014(b) [1977], provides, in part:

> The Secretary shall establish uniform national standards of eligibility ... for participation by households in the food stamp program in accordance with the provisions of this section. No plan of operation submitted by a State agency shall be approved unless the standards of eligibility meet those established by the Secretary, and no State agency shall impose any other standards of eligibility as a condition for participating in the program.[6]

The principal statute under the Food Stamp Act of 1977 relevant to this action is 7 U.S.C. § 2014(g) [1977].[7] That statute provides, in part, as follows:

> The Secretary shall prescribe the types and allowable amounts of financial resources (liquid and nonliquid assets) an eligible household may own, and shall, in so doing, assure that a household otherwise eligible to participate in the food stamp program will not be eligible to participate if its resources exceed $1,750, or, in the case of a household consisting of two or more persons, one of whom is age 60 or over, if its resources exceed $3,000. The Secretary shall, in prescribing inclusions in, and exclusions from, financial resources, follow the regulations in force as of June 1, 1977, and shall, in addition, (1) include in financial resources any boats, snowmobiles, and airplanes used for recreational purposes, any vacation homes, any mobile homes used primarily for vacation purposes, and any licensed vehicle (other than one used to produce earned income) used for household transportation or used to obtain or continue employment or to transport disabled household members to the extent that the fair market value of any such vehicle exceeds $4,500....

Pursuant to 7 U.S.C. § 2013(c) [1977], the Secretary of the United States Department of Agriculture is directed to issue regulations consistent with the Food Stamp Act of 1977 as "necessary or appropriate for the effective and efficient administration of the food stamp program...." As 7 U.S.C. § 2014(g) [1977], indicates, in determining food stamp eligibility, certain licensed vehicles shall be included in a household's financial resources "to the extent that the fair market value of any such vehicle exceeds $4,500...." The determination of "fair market value" under that statute is discussed in 7 C.F.R. § 273.8(g) [Revised as of January 1, 1980]. That regulation provides, in relevant part, as follows:

> The fair market value of licensed automobiles, trucks, and vans will be deter-

---

**5.** *W.Va.Code,* 9-2-3 [1970], provides as follows:
   The State assents to the purposes of federal-state assistance and federal assistance, accepts federal appropriations and other forms of assistance made under or pursuant thereto, and authorizes the receipt of such appropriations into the state treasury and the receipt of other forms of assistance by the department for expenditure, disbursement, and distribution by the department in accordance with the provisions of this chapter and the conditions imposed by applicable federal laws, rules and regulations.
   "Federal-state assistance" is defined, in *W.Va. Code,* 9-1-2 [1972], to include "food stamps,

which Congress has authorized the secretary of agriculture of the United States to distribute to needy persons."

**6.** *See also* 7 C.F.R. § 273.8(a) [Revised as of January 1, 1980], which states, in part, that "[t]he State agency shall apply the uniform national resource standards of eligibility to all applicant households...."

**7.** 7 U.S.C. § 2014 [1977], has been amended several times subsequent to the appellee's application for food stamps. Those amendments, however, are not relevant to this action.

mined by the value of those vehicles as listed in publications written for the purpose of providing guidance to automobile dealers and loan companies. Publications listing the value of vehicles are usually referred to as "blue books." The State agency shall insure that the blue book used to determine the value of licensed vehicles has been updated within the last 6 months. The National Automobile Dealers Association's (NADA) Used Car Guide Book is a commonly available and frequently updated publication. The State agency shall assign the wholesale value to vehicles. If the term 'wholesale value' is not used in a particular blue book, the State agency shall assign the listed value which is comparable to the wholesale value. The State agency shall not increase the basic value of a vehicle by adding the value of low mileage or other factors such as optional equipment. A household may indicate that for some reason, such as body damage or inoperability, a vehicle is in less than average condition. Any household which claims that the blue book value does not apply to its vehicle shall be given the opportunity to acquire verification of the true value from a reliable source. * * * If a vehicle is no longer listed in the blue book, the household's estimate of the value of the vehicle shall be accepted, unless the State agency has reason to believe the estimate is incorrect. In that case, and if it appears that the vehicle's value will affect eligibility, the household shall obtain an appraisal or produce other evidence of its value, such as a tax assessment or a newspaper advertisement which indicates the amount for which like vehicles are being sold.[8]

Under 7 U.S.C. § 2020(e)(10) [1977], of the federal Food Stamp Act of 1977, those states which participate in the food stamp program must provide "for the granting of a fair hearing and a prompt determination thereafter to any household aggrieved by the action of the State agency under any provision of its plan of operation as it affects the participation of such household in the food stamp program...."

Finally, it should be noted that, as appellant James E. Bragg of the West Virginia Department of Human Services indicated at the hearing, the regulations of the State of West Virginia relating to food stamps merely reflect the federal regulations.

## III

### Discussion

As stated in the briefs, the parties invite this Court to resolve several important issues, including the question of whether the appellee's $400 equity in the truck, rather than higher valuations, should have been attributed to him in determining food stamp eligibility and, further, the larger question of whether the refusal by the West Virginia Department of Human Services to accept that equity figure in determining eligibility violated the appellee's constitutional rights. Based upon the record presented to this Court, however, we do not reach those issues. For the reasons stated below, we are of the opinion that the attempt of the parties to determine the fair market value of the appellee's truck, as required under 7 U.S.C. § 2014(g) [1977], and 7 C.F.R. § 273.8(g) [Revised as of January 1, 1980], was wholly inadequate, and this action must be remanded for further proceedings.

At the hearing before the West Virginia Department of Human Services, Matilda Webb, the eligibility specialist who initially denied the appellee's application for food stamps, testified that she determined the appellee's truck to have a value of $7,625. She indicated that, during the period in question, the appellee's 1979 four-wheel-

8. The above quoted language of 7 C.F.R. § 273.8(g) [Revised as of January 1, 1980], relating to fair market value, is the same as the language found in 7 C.F.R. § 273.8(g) [Revised as of January 1, 1979]. Therefore, such regulatory language was in force in May, 1979, the time when the appellee applied for food stamps. It should be noted that 7 C.F.R. § 273.8(g) [Revised as of January 1, 1982], contains similar language and, in addition, states as follows: "If a new vehicle is not yet listed in the blue book, the State agency shall determine the wholesale value through some other means (e.g., contacting a car dealer which sells that make of vehicle)."

drive Chevrolet truck was not listed in the current valuation book of the National Automobile Dealers Association (NADA). Although the record is unclear, Webb apparently arrived at the $7,625 valuation by multiplying the appellee's monthly payment upon the truck ($209.70) by the total number of payments the appellee was required to make from the time he first purchased the truck.[9] Webb employed no other method in attempting to determine the value of the truck.[10]

On the other hand, the appellee testified that the truck had a value of $6,500, "according to King Coal Chevrolet." However, the appellee offered no explanation as to how the $6,500 valuation was determined.[11]

■ As indicated above, the parties made little effort to comply with applicable law in determining the value of the appel-

lee's truck. The regulation in question, 7 C.F.R. § 273.8(g) [Revised as of January 1, 1980], is quite specific. Under that regulation, the value of a vehicle, for food stamp eligibility purposes, "shall" be determined by its "wholesale value." Neither the computation of the eligibility specialist nor the statement of the appellee that the truck was worth $6,500 "according to King Coal Chevrolet" are adequate for this Court to conclude that the "wholesale value" of the truck was determined.[12] The record before this Court indicates that the value of the appellee's truck was never discussed in terms of its "wholesale value." It would be inappropriate, therefore, upon this record, to address constitutional issues.[13]

Inasmuch as the law surrounding the appellee's application for food stamps is largely federal, the issues relevant to that application for food stamps have national

**9.** To arrive at the $7,625 valuation, Webb must have employed an approximate figure of 36 months. Although the record does not state the exact price at which the appellee purchased the truck, the appellee indicated at the hearing that, upon purchase, he was obligated for 36 months.

**10.** At the hearing before the West Virginia Department of Human Services, Webb testified as follows:

Baker: Did you make any other attempt to value the car, other than multiplying the monthly payments by the amount of each payment?

Webb: No, because you know, like I say for reasonable knowledge from what I know about new vehicles, I saw no reason to. In fact, that was a little low in my opinion. I didn't make any further attempt.

Baker: Okay, so you didn't call any automobile dealer or anything to.

Webb: I didn't see any reason to. As many as we have come through here—uh—new '79's and that type truck, we've had so many of them, I saw no reason to call and check on it.
(Transcript of June 21, 1979, before the West Virginia Department of Human Services, at 7 and 8).

**11.** At the hearing before the West Virginia Department of Human Services, the following dialogue took place between the appellee and his attorney, Robert Baker:

Baker: Now you have 29 payments.
Bragg: Um—yep.

Baker: How much is each payment.
Bragg: $209.70 I believe it is.
Baker: I'm just multiplying that out, real quickly here. It would [be] about $6,000 total wouldn't it? ...
(Transcript of June 21, 1979, before the West Virginia Department of Human Services at 11 and 12). There is no evidence in the record, however, connecting the above calculation of Mr. Baker to the $6,500 valuation the appellee purportedly received from King Coal Chevrolet.

**12.** In *Duval v. Midwest Auto City, Inc.*, 425 F.Supp. 1381 (D.Neb.1977), *aff'd*, 578 F.2d 721 (8th Cir.1978), an action involving the improper alteration of automobile odometer readings, the United States District Court, in Nebraska, stated that an automobile's "wholesale value" is its "reasonable market value to a dealer," and an automobile's "retail value" is its "fair market value to an individual buyer from a dealer." 425 F.Supp. at 1384. Similarly, the phrase "wholesale price" is defined in BLACK'S LAW DICTIONARY 1432 (5th ed. 1979) as follows: "That which retailer pays in expectation of obtaining higher price by way of profit from resale to ultimate consumer." (citation omitted)

**13.** Without a proper record, a court has difficulty in effectively reviewing the actions of an administrative agency. *See Workman v. Workmen's Compensation Commissioner*, 160 W.Va. 656, 662, 236 S.E.2d 236, 240 (1977), an action which involved a claim for workmen's compensation (now "worker's compensation").

importance. As the parties indicated, those issues include questions relating to the appellee's constitutional rights. We decline, however, to address those issues, given the inadequacy of the record before us. We insist, therefore, that the vehicle in question be properly valued under applicable law.

We hold that in establishing the value of a licensed vehicle of a household as a financial resource in determining whether the household's financial resources, or assets, exceeded the limits of eligibility for food stamps under the federal Food Stamp Act of 1977, 7 U.S.C. § 2011 [1977], *et seq.*, for which food stamps the household applied in May, 1977, the West Virginia Department of Human Services (then the "West Virginia Department of Welfare") was required, pursuant to 7 U.S.C. § 2014(g) [1977], and applicable federal and state regulations, to determine the "fair market value" of the motor vehicle, and that fair market value was to be determined by the West Virginia Department of Human Services by assigning to the vehicle the vehicle's "wholesale value." 7 U.S.C. § 2014(g) [1977]; 7 C.F.R. § 273.8(g) [Revised as of January 1, 1980].

Accordingly, the final order of the Circuit Court of Kanawha County is reversed, and this action is remanded to that court for proceedings consistent with this opinion.

Reversed and remanded.